UNITED STATES of America, Appellant,

v.

SIX HUNDRED THIRTY–NINE THOU-
SAND FIVE HUNDRED AND FIFTY–
EIGHT DOLLARS ($639,558) IN UNIT-
ED STATES CURRENCY.

No. 91–5063.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 4, 1991.

Decided Feb. 7, 1992.

Jock A. Banks, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

Donald F. Samuel, Atlanta, Ga., for appellee.

Before MIKVA, Chief Judge, SILBERMAN and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge RANDOLPH.

Opinion concurring in part and concurring in the judgment filed by Circuit Judge SILBERMAN.

RANDOLPH, Circuit Judge:

The United States appeals from the judgment of the district court, Sporkin, J., dis-

missing the government's civil forfeiture action, brought under 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A), against the defendant $639,558. According to the amended complaint, after arresting Christopher Todd Bleichfeld, the government seized $635,000 in cash from his suitcases, and $4,558 from his person. Bleichfeld, asserting an interest in the money, entered the case by filing a verified claim in compliance with the Supplemental Rules for Certain Admiralty and Maritime Claims, and an answer to the government's complaint. All agree that the only question on appeal is whether the district court correctly granted Bleichfeld's motion to suppress the cash and several other items taken from the luggage on the ground that the officers conducting the search and seizure violated the Fourth Amendment to the Constitution.[1]

## I

Bleichfeld left Fort Lauderdale, Florida, on a train bound for New York City. 751 F.Supp. 6, 7 (D.D.C.1990). An Amtrak officer, checking passenger records, was drawn to Bleichfeld because he made his reservations two days before departure, did not give a "callback" number, purchased his ticket with cash only a few minutes before the train departed, and during the first leg of the journey changed rooms two times, switching from a "roomette" to a "double slumber" and then to a "bedroom," the most expensive compartment on the train.

When the train stopped at Washington's Union Station for a twenty-minute layover, two Amtrak officers, a dog trained to detect drugs, and the dog's handler, Detective Vance Beard of the Metropolitan Police Department, boarded the sleeper car and had the dog do a "sweep" of the corridor by Bleichfeld's compartment. Although the dog exhibited some interest, he did not "alert." 751 F.Supp. at 7. (The dog was trained to signal the presence of drugs aggressively, by biting and tearing at an object, or by scratching at a door with his paws.) Detective Beard and his dog "Axel" then left the train. One of the Amtrak officers, Officer Suave, knocked on Bleichfeld's door, identified himself and engaged Bleichfeld in conversation. Transcript of Motions Hearing Before Hon. Stanley Sporkin, 6/21/90 (Tr. I) at 99. Upon the officer's request, Bleichfeld showed him his ticket, which was in the name of "Chris Todd." When Officer Suave asked for identification, Bleichfeld produced a Florida driver's license in the name of Christopher Todd Bleichfeld. Bleichfeld refused to consent to a search of all his luggage and his compartment. After some prodding, he agreed to allow a dog sniff of his luggage, which consisted of a briefcase, a small suitcase and a large suitcase weighing some eighty pounds. Detective Beard then returned with Axel. Bleichfeld placed the luggage in the corridor outside his room, as the officers requested. The dog alerted to two of the three bags. Bleichfeld refused to consent to a search of the bags, and asked to discuss the matter with the officers inside his room. Officer Suave said he would have to take Bleichfeld off the train and apply for a search warrant. Tr. I at 66. Bleichfeld was then arrested, handcuffed and removed, with his luggage, from the train. 751 F.Supp. at 7.

Because the luggage was heavy, the officers decided not to try to carry it out by themselves. After the train pulled away, they waited on the platform with Bleichfeld for some period of time. Tr. I at 68. No one else was there. "Finally," according to Officer Suave, an Amtrak employee with a radio passed by; the officers asked the employee to call for an electric cart with a driver to come pick them up. *Id.* The officers waited at least another ten minutes on the platform until the cart appeared. *Id.* They were then driven to a security office within Union Station. *Id.* at 113. In the office, Bleichfeld was handcuffed to a chair. Transcript of Evidentiary Hearing Before Hon. Stanley Sporkin, 10/22/90 (Tr. II) at 20–21. Although there was a secure

---

**1.** The money remains with the government as a result of a stay issued by the district court pending this appeal.

storage facility in Union Station, the officers decided to place the luggage in the same room with Bleichfeld. Tr. I at 113. Officer Suave testified that Bleichfeld nevertheless would have been unable to reach his bags. *Id.*

The officers originally intended to seek a search warrant to open the luggage. 751 F.Supp. at 7. Detective Beard telephoned Robert Andary, an Assistant United States Attorney, to inquire about getting a warrant. Tr. II at 8. The record is not entirely clear about the location from which the call was made. Officer Suave testified that he and Detective Beard "jumped into the car and went over to police headquarters and we thought we were going to have to write up a warrant. But we called the Assistant U.S. Attorney who was on duty at that time." Tr. I at 71. AUSA Andary thought Detective Beard said he was calling from Union Station. Tr. II at 10. Detective Beard was not asked and the district court made no findings regarding where the call originated. At any rate, the AUSA, based on the information he received over the telephone, advised that a warrant was unnecessary. *Id.* at 11. The officers then searched Bleichfeld's luggage

without a warrant. They found no drugs. Instead they discovered $635,000 in cash, keys later traced to safety deposit boxes here and abroad, and ledgers indicating financial transactions.[2] Although Bleichfeld was initially charged in a criminal complaint, he was never indicted.

In this civil forfeiture action, the district court ruled that a warrant was needed to search the luggage and that the exception for searches incident to arrests did not apply because the search here was too remote from the actual arrest in both time and place. 751 F.Supp. at 8–10. Rejecting the government's alternative justification that the cash, keys and ledgers inevitably would have been discovered later because the police would have opened Bleichfeld's luggage to conduct an inventory, the court granted Bleichfeld's motion to suppress. When the government informed the court that it could not proceed without the suppressed evidence, the court entered an order dismissing the case.[3]

## II

Money furnished "in exchange for a controlled substance" or "traceable to such an

---

**2.** Axel alerted, all agree, to cocaine adhering to the cash in Bleichfeld's luggage. When some of the cash was later washed in a vat at the Drug Enforcement Administration, cocaine showed up. Tr. I at 126. In order to blunt the implications of this, Bleichfeld called an expert, Dr. James Woodford, who testified that 90 percent of all cash in the United States contains sufficient quantities of cocaine to alert a trained dog. *Id.* at 28–29. Officer Beard, the dog handler, suggested on the basis of hearsay that the number was lower, near 70 percent. (There is at least one study indicating that up to 97 percent of all bills in circulation in the country are contaminated by cocaine, with an average of 7.3 micrograms of cocaine per bill. *Crime and Chemical Analysis,* 243 Science 1554, 1555 (1989).)

Why the nation's currency is so thoroughly corrupted has been a topic of inquiry. It has been estimated that one out of every three circulating bills has been involved in a cocaine transaction. R. Siegel, Intoxication 293 (1989). Cocaine attaches—in a variety of ways—to the bills, which in turn contaminate others as they pass through cash registers, cash drawers, and counting machines at banks and commercial establishments, *id.; Crime and Chemical Analysis, supra* note 2, at 1555; Tr. I at 28. Dr.

Woodford testified that, as a result, bills may contain as little as a millionth of a gram of cocaine, but that is many times more cocaine than is needed for a dog to alert. Officer Beard related that 10 percent of the alerts he had witnessed were to cash alone, a phenomenon we have encountered before. *United States v. Trayer,* 898 F.2d 805, 808–09 & n. 3 (D.C.Cir. 1990). *See generally* Taslitz, *Does the Cold Nose Know? The Unscientific Myth of the Dog Scent Lineup,* 42 Hastings L.J. 15, 29 & n. 71 (1990). If the information related above proves accurate, a court considering whether a dog sniff provides probable cause, *see generally United States v. Colyer,* 878 F.2d 469, 471 & n. 2, 483 (D.C.Cir. 1989), may have to take into account the possibility that the dog signalled only the presence of money, not drugs.

**3.** The court did not rule on Bleichfeld's additional contentions that the dog's alert, alone, failed to provide probable cause to arrest and search him; that upon opening the suitcases and finding no drugs, Bleichfeld and his property should have been released; and that the initial encounter with Bleichfeld on the train, before the dog's alert, amounted to an arrest without probable cause, tainting what transpired later.

exchange" is subject to forfeiture. 21 U.S.C. § 881(a)(6). In a civil forfeiture action, the government must introduce evidence showing probable cause to believe the money falls within section 881(a)(6) (or another provision of the forfeiture laws). 21 U.S.C. § 881(d); 19 U.S.C. § 1615.[4] In this case, the government conceded that if the search of the luggage violated the Fourth Amendment, the exclusionary rule would prevent it from introducing the cash, the keys and the ledgers in order to carry its burden of proof. Memorandum of Points and Authorities in Opposition to Claimant's Motion to Suppress, 5/31/90, at 4. The concession rested on *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 697, 85 S.Ct. 1246, 1249, 14 L.Ed.2d 170 (1965), a review of a state civil forfeiture proceeding in which the Court held that the exclusionary rule barred the government from relying on evidence derived from an illegal search "to sustain a forfeiture." *Id.* at 698, 702, 85 S.Ct. at 1249, 1251.[5]

In evaluating the government's claim that no illegal search occurred here, we begin with the "cardinal principle" (*Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978)) that warrantless searches "are *per se* unreasonable" unless the search falls within the "few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). *See, e.g., California v.*

*Acevedo*, —— U.S. ——, 111 S.Ct. 1982, 1991, 114 L.Ed.2d 619 (1991); *Coolidge v. New Hampshire*, 403 U.S. 443, 454, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). The government maintains that two exceptions apply. The first is that the search of the luggage was incident to Bleichfeld's arrest, thus obviating the need for a search warrant. We are in agreement with Judge Sporkin that the search cannot be sustained on that ground.

## A

■ In order to ensure his safety, and prevent the destruction of evidence, an officer may conduct a warrantless search of the arrestee's person and "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). This exception does not apply when the warrantless search "is remote in time or place from the arrest," *Chimel*, 395 U.S. at 764, 89 S.Ct. at 2040, quoting *Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), such that "no exigency exists." *United States v. Chadwick*, 433 U.S. 1, 15, 97 S.Ct. 2476, 2485, 53 L.Ed.2d 538 (1977). *New York v. Belton*, 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981), written by Justice Stewart, the author of *Chimel*, characterized this as a requirement that searches incident to arrest be "contemporaneous"

---

**4.** Once probable cause is shown, the burden shifts to the claimant to establish that the money was lawfully obtained. 19 U.S.C. § 1615.

**5.** When illegally seized property is itself the "defendant" in the forfeiture proceeding, it may not be "relied upon to sustain a forfeiture," *Plymouth Sedan*, 380 U.S. at 698, 85 S.Ct. at 1249, but it is not "excluded" from the proceeding entirely. Such property may be offered into evidence for the limited purpose of establishing its existence, and the court's *in rem* jurisdiction over it. This, we think, is the import of the Second Circuit's recent statement that with respect to unlawfully obtained property that is the subject of the forfeiture suit, "the property itself cannot be excluded from the forfeiture action," *United States v. $37,780 in U.S. Currency*, 920 F.2d 159, 163 (2d Cir.1990). In other words, as the Supreme Court suggested in *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1041, 104 S.Ct. 3479,

3484, 82 L.Ed.2d 778 (1984), the fact that the defendant property had been seized after an illegal search does not "immunize" it from forfeiture, any more than a defendant illegally arrested is immunized from prosecution. *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980). *See, e.g., United States v. One (1) 1987 Mercury Marquis*, 909 F.2d 167, 169 (6th Cir.1990); *United States v. U.S. Currency $31,828*, 760 F.2d 228, 230–31 (8th Cir.1985). Thus, other evidence, legally obtained, may be introduced to establish that the property should be forfeited to the government. *United States v. One (1) 1971 Harley–Davidson Motorcycle*, 508 F.2d 351 (9th Cir. 1974). In this case the government apparently had no such other evidence and, for that reason, the district court dismissed the action after ordering the cash (and the keys and ledgers) suppressed.

with the arrest—a long-standing condition to dispensing with a warrant. *See, e.g., Stoner v. California,* 376 U.S. 483, 486, 84 S.Ct. 889, 891, 11 L.Ed.2d 856 (1964); *Agnello v. United States,* 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145 (1925).[6] This court has framed the inquiry as "whether the search in question was undertaken as an integral part of a lawful custodial arrest process," *United States v. Brown,* 671 F.2d 585, 587 (D.C.Cir.1982) (per curiam).

The significance to this case of the Supreme Court's decision in *United States v. Chadwick* is in dispute. The defendants in *Chadwick* were arrested outside a train station while loading a footlocker into the trunk of a car, after a police dog had signaled the presence of drugs inside the closed container. 433 U.S. at 4, 97 S.Ct. at 2479. The defendants and the footlocker were taken to a federal building; more than an hour later officers searched the footlocker without a warrant. *Id.* The Court held that "no exigency ... to support the need for an immediate search" existed at that point. *Id.* at 15, 97 S.Ct. at 2486. "Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *Id.*

Like Judge Sporkin, we perceive no principled basis on which this case may be distinguished from *Chadwick.* Before searching Bleichfeld's luggage, the officers had "reduced" the luggage "to their exclusive control." Bleichfeld had been arrested and was handcuffed to a chair. The officers did not fear for their safety; there was no possibility that Bleichfeld could destroy any evidence. Any need for swift action had by that time disappeared. Bleichfeld, like the arrestees in *Chadwick,* no longer had access to the luggage. *See Chadwick,* 433 U.S. at 16 n. 10, 97 S.Ct. at 2486 n. 10; *see also United States v. Vasey,* 834 F.2d 782, 787 (9th Cir.1987). To be sure, the search of the footlocker in *Chadwick* took place some ninety minutes after the arrests whereas the search of Bleichfeld's suitcases occurred somewhat sooner.[7] But the fact remains that this search did not "follow[ ] immediately upon" Bleichfeld's arrest (*New York v. Belton,* 453 U.S. at 462, 101 S.Ct. at 2865), or only a few minutes later. *Compare United States v. Herrera,* 810 F.2d 989, 990 (10th Cir.1987), sustaining a warrantless search of defendant's briefcase conducted a "few

6. Searches of the person and articles "immediately associated with the person of the arrestee," *Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485, are treated differently. *United States v. Edwards,* 415 U.S. 800, 805–06, 94 S.Ct. 1234, 1238, 39 L.Ed.2d 771 (1974), held that an arrestee's clothing, which could have been searched incident to his arrest, could therefore be searched while he was in a holding cell at the police station. *Chadwick* distinguished *Edwards* on the ground that an arrest diminished one's expectation of privacy in one's person, thereby rendering reasonable any later search. 433 U.S. at 16 n. 10, 97 S.Ct. at 2486 n. 10.

7. The district court's initial opinion said only that a "good deal" of time passed between the arrest of Bleichfeld on the train and the search of his bags in the security office. 751 F.Supp. at 9. The court's Memorandum Opinion and Order (filed Dec. 13, 1990), in response to the government's motion for reconsideration, refers to a "30 minute delay" (an estimate argued for in the government's motion) and states that such a delay was "ample" to take the search out of the incident-to-arrest exception. *Id.* at 1.

As we reckon it, *at least* thirty minutes passed. Captain Moss testified that it took one to three minutes to get Bleichfeld and his bags off the train. Tr. II at 48. Officer Suave testified that the group had to wait on the platform before calling a baggage cart, and then waited ten minutes for a cart to show up. Tr. I at 68. Captain Moss estimated that it took five to ten minutes to get Bleichfeld from the platform to the security office. Tr. II at 48. Though there is some confusion on the point, *see supra* page 4, Officer Suave testified that he and Detective Beard drove to the police station to make the phone call to the AUSA. Tr. I at 71. At any rate, Captain Moss testified that he remained in the security office for fifteen to twenty minutes before leaving, and that the results of the phone call were not known when he departed. Tr. II at 50. If one assumes that the wait on the platform prior to calling the cart was five to ten minutes, and that the search took place five to ten minutes after Moss' departure, the interval between arrest and search ranges from 41 minutes to 63 minutes.

minutes" and "short distance" from his arrest, *with United States v. Vasey*, 834 F.2d 782, 787–88 (9th Cir.1987), rejecting as not contemporaneous a search of defendant's car thirty-five to forty minutes after his arrest. In the language of *Chadwick,* "no exigency" existed at the time of this search, by which *Chadwick* meant no "danger that the arrestee might gain access to the property to seize a weapon or destroy evidence." 433 U.S. at 15, 97 S.Ct. at 2485.[8]

The search here is thus a far cry from the one that took place in *United States v. Tavolacci,* 895 F.2d 1423, 1426–28 (D.C.Cir. 1990), relied on by the government. Unlike Bleichfeld, Tavolacci was not handcuffed to a chair when the search was conducted; he was standing next to his bags. The search of his bags took place on the train platform, not in a security office; it occurred within minutes of the arrest, not at least half an hour later. We cannot give *Tavolacci* the meaning the government seems to suggest—namely, that whenever officers could have conducted an immediate search of the defendant's property incident to the arrest, they are free to do so without a warrant at any later time. That reading would render *Tavolacci* inconsistent with *Chadwick.* In his dissenting opinion in *Chadwick,* Justice Blackmun, joined by then-Justice Rehnquist, argued unsuccessfully for a similar rule. As against Justice Blackmun's view "that a warrant is not required to seize and search any movable property in the possession of a person properly arrested in a public place," 433 U.S. at 19, 97 S.Ct. at 2487 (dissenting opinion), the majority in *Chadwick* decided that once the reasons for permitting a contemporaneous search without a warrant no longer pertain, the search-incident-to-arrest exception does not apply.

The government suggests that the precedential value of *Chadwick* has been eroded by *California v. Acevedo,* —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), and that we should "not expand the type of cases" that would be governed by *Chadwick.* Brief for Appellant at 16 n. 8, 18, 21–22. *Acevedo* dealt with a different exception to the warrant requirement, an exception for searches of automobiles based upon probable cause. Because of the diminished expectation of privacy in automobiles and their mobility, the Court held in *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), that "if the police have probable cause to seize an automobile on a public roadway, they may conduct an immediate or delayed search of the vehicle." *Acevedo,* 111 S.Ct. at 1986.[9] *Chadwick* refused to apply the *Chambers* rationale to searches of other movable containers. This raised an obvious question when closed containers were found in automobiles: did *Chadwick* require the police to obtain a warrant to open the containers or did *Chambers* allow a search without a warrant? The Court's answers led to con-

8. We recognize that searches incident to arrest need not always take place before the defendant is handcuffed, or while the police are in immediate fear for their safety or for the security of evidence. Though such concerns are the basis for the exception, it is not necessary that they be present in each particular case. *United States v. Robinson,* 414 U.S. 218, 235–36, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). In addition, the strength of those concerns has led courts to provide the police a brief cushion of time within which to search after they have gained complete control. *Cf. Belton,* 453 U.S. at 461–62 n. 5, 101 S.Ct. at 2865; *United States v. Tavolacci,* 895 F.2d 1423, 1428–29 (D.C.Cir.1990). When dealing with searches other than of the person, *see supra* note 7, however, the requirement of contemporaneity still exists, as it must if "[t]he scope of" a search incident to arrest is to remain "strictly tied to and justified by the circumstances which render[ it] ... permissible." *Chi-*

*mel,* 395 U.S. at 762, 89 S.Ct. at 2039, *quoting Terry v. Ohio,* 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968).

9. The original rationale for treating automobiles differently rested solely on their mobility. While this might excuse the warrantless *seizure* of a car under the emergency exception to the warrant requirement, the Court came to recognize that it was analytically insufficient to justify the subsequent *search* of the car without prior judicial approval. *See Cady v. Dombrowski,* 413 U.S. 433, 441–42, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). The Court has thus explained the automobile exception in terms of the "lesser expectation of privacy in a motor vehicle," *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974). *See also South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976).

fusion in the lower courts and among law enforcement officers. *Acevedo*, 111 S.Ct. at 1989. *Acevedo*, which overruled *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), ended the confusion by holding that the automobile exception permitted police, when they have probable cause, to search containers in cars without a warrant.

The basic holding of *Chadwick* thus survived *Acevedo*. Whatever merit there is to the government's point that *Chadwick* is wobbly, an inferior court cannot disregard it. The Supreme Court retains the exclusive prerogative of overruling its own decisions and until it does so, the lower courts are bound to follow them. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 1922, 104 L.Ed.2d 526 (1989). As we have said, *Chadwick* rejected the argument that because an immediate search without a warrant could have been justified as incident to arrest, that exception would justify a warrantless search of a closed container conducted later, after the exigency had ended. Since our duty is to apply *Chadwick*, we hold that the search of Bleichfeld's luggage cannot be sustained as incident to his arrest.

### B

In the alternative, the government argues that the "inevitable discovery doctrine" of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), rendered the cash, keys and ledgers found in Bleichfeld's luggage admissible. Citing *South Dakota v. Opperman*, 428 U.S. at 373, 96 S.Ct. at 3099, and *Illinois v. Lafayette*, 462 U.S. 640, 646, 103 S.Ct. 2605, 2609, 77 L.Ed.2d 65 (1983), the government maintains that "even if the suppressed property and evidence had not been discovered at the Union Station security office, it definitely would have been discovered later during a lawful inventory search by police

at the station." Brief for Appellant at 28. Bleichfeld has two responses: if the government's version of inevitable discovery prevailed, it would emasculate the limits placed on the search-incident-to-arrest exception to the warrant requirement;[10] and an inventory of the luggage was not in fact inevitable.

The government is confident that *Nix* applies here, but we are not told why. The government simply slaps *Nix* down on the table, and begins arguing that an inventory was inevitable. The Assistant United States Attorney who told the officers that a warrant was not required also cited the eventual inventory of the luggage to explain why he so advised them. Given the posture of the case, the issue whether *Nix* applies is before us. The government's failure to argue the point cannot make the issue disappear, as our concurring colleague supposes. We have held, as did the district judge, that the warrantless search of Bleichfeld's luggage violated the Fourth Amendment. The government had the burden of showing why the items recovered were nevertheless admissible. The only ground suggested is the inevitable discovery exception to the exclusionary rule recognized in *Nix*. We therefore must either face the question whether *Nix* applies or decide the case by assuming *arguendo* that it does. We ultimately take the latter course, resting our decision on the fact-bound determination that Bleichfeld's luggage was not inevitably destined for an inventory. Our choice of this decisional ground reflects more than the customary reluctance to settle a question not fully argued. It reflects doubts about applying *Nix* to cases such as this one. The source of our doubts should be explained.

■ In considering *Nix*, it is helpful to begin by stating some general principles regarding the exclusionary rule as it has developed in the context of the Fourth

**10.** Bleichfeld makes the point this way:

> If the government's position were sound—if every unlawful search incident to arrest could be resurrected by the inevitable discovery doctrine—the law of searches incident to arrest would disappear. *Belton* would never

have been decided. *Chimel* was merely dicta. The recent Supreme Court decision in *Acevedo v. California* [*California v. Acevedo*] was a waste of time.
>
> Brief of Appellee/Claimant at 23.

Amendment. The first is that an article discovered or an observation made during the course of an illegal search or seizure—"primary evidence"—may not be admitted into evidence when a party with standing objects to its introduction. *See, e.g., Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); *Segura v. United States,* 468 U.S. 796, 804–05, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984); *United States v. Karo,* 468 U.S. 705, 714–15, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530 (1984); *United States v. Chadwick,* 433 U.S. at 11–13, 97 S.Ct. at 2483–84; *Chimel v. California,* 395 U.S. at 767, 89 S.Ct. at 2042; *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); 4 W. LA FAVE, SEARCH AND SEIZURE § 11.4, at 369 (1987). For evidence discovered after the primary illegality—"derivative evidence"—the question initially is one of "taint." Is the evidence the "fruit of the poisonous tree" because it was obtained by exploiting the Fourth Amendment violation? *See Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Or is it untainted because it stems from a source wholly independent of the constitutional violation? *See Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *Alderman v. United States,* 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176 (1969).[11]

*Nix v. Williams* involved only derivative evidence. Two lines of investigation were converging on the same evidence—the body of a ten-year-old girl. After finding clues to the location of the missing girl, who had disappeared from Des Moines, Iowa, police organized a group of volunteers, who began searching in a westerly direction from Poweshiek County toward

Des Moines. After the search was under way, Williams surrendered in Davenport and a detective, while transporting Williams back to Des Moines, elicited incriminating statements from him in violation of his right to counsel. Williams' statements led the detectives to the body. At the time, the search party was only a few miles away and would have come upon the body if their efforts had continued.

With respect to the primary evidence—the statements elicited from Williams in violation of his Sixth Amendment right to counsel—the Court held in an earlier decision that these must be suppressed. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The evidence derived from that illegality, however, was another matter. "The core rationale," the Court stated in *Nix,* "for extending the exclusionary rule to [derivative] evidence ... is ... to deter police from violations of constitutional and statutory protections" (467 U.S. at 442–43, 104 S.Ct. at 2508), but "derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." *Id.* at 443, 104 S.Ct. at 2508. Thus, when evidence "has been discovered by means wholly independent of any constitutional violation," "exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id.* at 443–44, 104 S.Ct. at 2509. In *Nix,* however, this "independent source doctrine" did not apply; "Williams' statements to [the detective] indeed led the police to the child's body...." *Id.* at 443, 104 S.Ct. at 2508. Nevertheless, if derivative evidence "ultimately or inevitably would have been discovered by lawful means," it too should be admissible because "exclusion would also put the government in a worse position" than if no illegality had occurred. *Id.* The Court thought that recognizing an inevitable discovery rule would not encourage unconstitutional police conduct because

---

**11.** Even if derivative or secondary evidence cannot be traced to a logically independent source, a further inquiry may be needed to determine whether the evidence was obtained " 'by exploitation of that [prior] illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Wong Sun v. United States,* 371 U.S. at 488, 83 S.Ct. at 417 (citation omitted).

"a police officer faced with the opportunity to obtain evidence illegally will rarely, if ever, be in a position to calculate whether the evidence sought to be introduced would inevitably have been discovered"; even if an officer were in such a position, the Court reasoned, he would refrain from engaging in "dubious 'shortcuts' to obtain the evidence." *Id.* at 446, 104 S.Ct. at 2510. *Nix,* in short, rested on the Court's judgment that the deterrent effects of the exclusionary rule reach the point of diminishing returns when, unknown to the officers engaging in illegal conduct, a separate line of lawful investigation would have come upon the same evidence.

The reasoning of *Nix* in support of the inevitable discovery exception relied heavily on the derivative nature of evidence, and the Court's statement about not putting the government in a worse position because of police misconduct was limited to that subject. Whether the Court will adhere to that line may, however, be open to question in light of *Murray v. United States,* 487 U.S. 533, 540–41, 108 S.Ct. 2529, 2535, 101 L.Ed.2d 472 (1988), a decision concerning the independent source doctrine. In *Murray,* DEA agents conducting an illegal warrantless search of a warehouse observed bales of marijuana. The agents then left the warehouse, obtained—on the basis of independent information they possessed prior to the search—a warrant, and searched again. *Id.* at 535–36, 108 S.Ct. at 2532. The Court held that evidence discovered during the illegal search could nevertheless be admitted if it was reacquired during a second, lawful search with a warrant, so long as the warrant was obtained solely on the basis of information from an "independent source." *Id.* at 541–42, 108 S.Ct. at 2535. The Court believed that the deterrent effect of the exclusionary rule would not be diminished in such a case, and rejected the argument that a different result was compelled because primary, not derivative, evidence was involved. *Id.* at 539–41, 108 S.Ct. at 2534–35.

In *United States v. Gale,* 952 F.2d 1412, 1414 (D.C.Cir.1992), though we did not discuss the applicability of the inevitable discovery doctrine, we nevertheless applied it consistently with the deterrence-based rationale of *Nix.* Gale had been stopped legally for questioning. After he admitted possessing drugs, the police asked him—in violation of the Fifth Amendment—whether he had any other drugs. He said that he did, and that they were on his person and in the trunk of his car. 952 F.2d at 1413. The defendant challenged admission of his statements and the drugs. We did not apply the inevitable discovery doctrine to the primary results of the illegality—the statements—which were suppressed. However, since the police officers in *Gale* were not in a position to calculate, at the time they conducted the illegal interrogation, that the drugs were located in an area to be inventoried later, no deterrent purpose would have been served by excluding the drugs themselves, which we refused to suppress.

Several other courts of appeals, when faced with inevitable discovery claims resting on the prospect of an inventory search, have either rejected or ignored any distinction between primary and derivative evidence, as well as the deterrence inquiry called for by *Nix. See, e.g., United States v. Mancera–Londono,* 912 F.2d 373, 375–76 (9th Cir.1990); *United States v. Arango,* 879 F.2d 1501, 1506–07 (7th Cir.1989); *United States v. Pimentel,* 810 F.2d 366, 368–69 (2d Cir.1987). Whatever one may think of the distinction, the fact remains that *Nix* drew it, and did so for the purpose of demonstrating that the deterrent effects of the exclusionary rule would not be lessened. In this case, one would be hard put to make that demonstration. The Fourth Amendment violation to be deterred by excluding the evidence is the failure to obtain a warrant. This we take as a given in light of *Chadwick*'s holding that a non-contemporaneous post-arrest search without a warrant violates the Fourth Amendment, at least when undertaken as a " 'means of discovering evidence of crime.' " *Florida v. Wells,* 495 U.S. 1, 5–6, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990), quoting *Colorado v. Bertine,* 479 U.S. 367, 376, 107 S.Ct. 738, 744, 93 L.Ed.2d 739 (1987) (Blackmun, J., concurring). If the evidence stemming

from the violation is nevertheless admissible on the basis that the bags inevitably would have been opened when they were later inventoried, the practical consequence is apparent. In the vast run of cases, there would be no incentive whatever for police to go to the trouble of seeking a warrant (or, we should add, of waiting for a lawful inventory to occur during normal processing). The police could readily make this assessment on their own. Contrary to what *Nix* supposed, they would almost invariably be in a position "to calculate whether the evidence ... would inevitably have been discovered," 467 U.S. at 446, 104 S.Ct. at 2510, because they would know that inventory procedures were in place.

█ As we have said, the facts of this case enable us to avoid deciding whether, as the government presumes, the inevitable discovery doctrine applies. On one point all courts agree—the later discovery of the evidence through a lawful inventory must in fact have been inevitable.[12] Since that clearly is not the situation here, we shall proceed on the basis that the inevitable discovery exception is available.

Judge Sporkin found that "the discovery of the money was not inevitable" because absent a search of the luggage Bleichfeld would have been released. A factual finding will be reversed only if it is clearly erroneous. *United States v. Williams*, 951 F.2d 1287, 1289 (D.C.Cir.1991). Here there is ample support. AUSA Andary testified that "[t]his was not an inventory search." Tr. II at 35. He admitted that it was "not an inevitable consequence of this set of facts" that Bleichfeld's luggage would have been opened "through an inventory." *Id.* He testified that had the officers tried to get a warrant, "they would not have opened [the luggage] if they were in the active process." *Id.* at 36. And while the government points to the testimony of Officer Hurrin of the Metropolitan Police Department, who testified that "the suitcase was inventoried" because Bleichfeld *could* have been indicted based on probable

cause, Tr. I at 166, Officer Hurrin also agreed that it was "inconceivable" that Bleichfeld *would* have been "arrested and charged with a narcotics violation without ever having looked in the suitcase." *Id.* at 165.

The upshot of all this—correctly apprehended by Judge Sporkin—is that an inventory search here was anything but "inevitable." Far from being the sort of "historical fact", *Nix* contemplated, 431 U.S. at 445 n. 5, 104 S.Ct. at 2509 n. 5, it was merely hypothetical. Though Bleichfeld was under arrest, without the discovery *in the security office* of more evidence, neither he nor his luggage would ever have wound up "at the [police] station." Brief for Appellant at 28. Bleichfeld was not like the defendant in *United States v. Andrade*, 784 F.2d 1431 (9th Cir. 1986), relied on by the government, whose "transfer to the ... holding facility ... for processing was inevitable." *Id.* at 1433. Introduction of the evidence taken from Bleichfeld's luggage therefore cannot be justified by the inevitable discovery doctrine and, as we have explained above, the search was not "incident" to his arrest. Accordingly, the decision of the district court is

*Affirmed.*

SILBERMAN, Circuit Judge, concurring in part and concurring in the judgment:

I concur fully in the majority's opinion with the exception of its lengthy detour (Maj.Op. at 718–21) to address a question which was, to say the least, "not fully argued"—whether the inevitable discovery exception to the exclusionary rule applies to primary as well as derivative evidence. Not only is discussion of this issue in no way necessary to our decision, since we assume that the exception would apply to the evidence here and determine that the discovery would not have been inevitable (Maj.Op. at 721), but, more important, the issue was, in fact, never raised in any intelligible form in this case. Nor, for that

---

**12.** The government must establish this by a preponderance of the evidence. *Nix v. Williams,*

467 U.S. at 444, 104 S.Ct. at 2509.

**722**

matter, was the issue ever presented to the panel in *United States v. Gale,* 952 F.2d 1412, 1414 (D.C.Cir.1992), our recent inevitable discovery opinion, or, apparently, to the Seventh and Ninth Circuits—which the majority indelicately chides for "ignor[ing]" the distinction (Maj.Op. at 720)—in *United States v. Mancera–Londono,* 912 F.2d 373, 375–76 (9th Cir.1990), and *United States v. Arango,* 879 F.2d 1501, 1507 n. 2 (7th Cir.1989), *cert. denied,* 493 U.S. 1069, 110 S.Ct. 1111, 107 L.Ed.2d 1019 (1990).[1]

Where the issue *was* argued, in *United States v. Pimentel,* 810 F.2d 366, 368–69 (2d Cir.1987), the Second Circuit flatly and persuasively rejected the distinction. *See also United States v. Whitehorn,* 829 F.2d 1225, 1232 (2d Cir.1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988). Moreover, if the distinction ever was important, it may well have been undermined by the Supreme Court's decision in *Murray v. United States,* 487 U.S. 533, 540–41, 108 S.Ct. 2529, 2535, 101 L.Ed.2d 472 (1988)—a point the the majority acknowledges (Maj.Op. at 720) but then brushes aside so as not to diminish its discourse.

Wholly apart, however, from this concern that my colleagues are muddying rather than elucidating the law in this area, striking out very much on their own where no circuit has gone before, my fundamental objection is to the interjection into the opinion of an issue not raised or argued by the parties. The majority's justification for its lengthy discussion of the issue is labored and unconvincing (Maj.Op. at 718). It cannot be that the mere citation of a case by a party opens the door for Article III judges to propound their views on the relevance of any and all conceivable implications of the cited opinion to the case at hand. (Appellant cited *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), only to acknowledge the inevitable discovery rule.) Under the majority's approach, a

party's citation of a multi-issue case for a single one of its propositions would serve as a justification for virtually unlimited judicial exposition regarding propositions not at issue in the case.

I suppose, now that many of our law reviews are dominated by rather exotic offerings of increasingly out-of-touch faculty members, the temptation for judges to write about issues that interest them—whether or not raised by the parties or constituting part of the logic of the decision—is even greater. But I wish we would resist the temptation and decide one case at a time.

**1.** The Eighth Circuit somehow avoided a scolding despite its holding (without any *dicta* expressing "doubts") that the inevitable discovery rule applied to primary evidence in the unlawful search incident to arrest context. *United States v. McConnell,* 903 F.2d 566, 570 (8th Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1011, 112 L.Ed.2d 1093 & — U.S. —, 111 S.Ct. 1393, 113 L.Ed.2d 449 (1991); *see also United States v. Andrade,* 784 F.2d 1431, 1433 (9th Cir.1986).