**UNITED STATES of America, Plaintiff,**

v.

**Ariel FIGUEROA CRUZ, Defendant.**

**Cr. No. 93–019 (PG).**

United States District Court,
D. Puerto Rico.

May 13, 1993.

Opinion Denying Reconsideration
June 8, 1993.

---

Warren Vázquez, Asst. U.S. Atty., Hato Rey, P.R., for plaintiff.

Fernando J. Carlo, Hato Rey, P.R., for defendant.

PEREZ–GIMENEZ, District Judge.

## OPINION AND ORDER

On April 5, 1993, Magistrate Judge Justo Arenas recommended that this Court deny the above named defendant's motion to suppress. The defendant timely objected to said Report and Recommendation, specifically contending that the search of his belongings was not carried out incident to a lawful arrest. After carefully reviewing the transcript of the suppression hearing, the parties' memoranda, and the applicable caselaw, this Court concludes that the defendant's arrest was indeed lawful. However, the subsequent property search violated the Fourth Amendment. As a result, the incriminating evidence obtained therefrom must be suppressed.

### I. The Facts

The salient facts surrounding the defendant's arrest and subsequent search of his belongings are well summarized in the Magistrate's Report and Recommendation at pages 1–4. These are as follow.

The defendant was arrested on January 8, 1993 at the Luis Muñoz Marín International Airport as he passed through a security checkpoint on his way to board a domestic flight. He was later indicted for

possession with intent to distribute cocaine....

At the hearing on the matter, the United States presented the testimony of Gladys Martínez del Valle, a security employee of Airport Aviation Services, and Police Officer Juan Avilés.

Gladys Martínez testified that on the date in question she was on duty at the checkpoint for gates 31 to 42 when a wine colored suitcase went through the x-ray machine. She saw something prohibited or dubious. She took the suitcase from the machine. The owner of the suitcase was travelling on US Air to Philadelphia. She asked him if the suitcase belonged to him and he said that it did. She then asked him what was inside and he said that it contained presents, figurines. The passenger's name was Gerónimo Pizarro. She asked him to please open his suitcase and she also asked him to open the package with the presents in it which was inside the suitcase. At the exact moment, she noticed a second suitcase going through the x-ray machine which contained more or less the same of what she had seen in the first suitcase. There were two large parcels, one smaller than the other, visible on the x-ray monitor. The witness had to verify the contents of the suitcases. Since she was also going to check the second suitcase, she called Brenda Pagán, her supervisor on duty, and Police Officer Avilés. The first passenger was trying to avoid opening the parcel itself. While the first passenger finished opening the parcel, the second passenger was asked if the suitcase was his. He said that it was. The second passenger is the defendant in this case. He was asked if the suitcase could be "checked." As the first passenger finished opening the parcels, the employee noticed that there were blocks inside the presents. She opened the defendant's suitcase and saw two presents identical to the presents in the first suitcase. At that time, Officer Avilés placed the first passenger under arrest. The officer saw the defendant Ariel Figueroa had the same type of packages. The officer arrested him, handcuffed him and read him his rights.

On cross-examination, Ms. Martínez noted that the bags went one after the other. Pizarro unwrapped the presents which were wrapped in Christmas wrapping paper. When he opened the package, there was second layer of wrapping inside of the outside wrapping. One gift box was wrapped in another gift box. When Pizarro opened his bag, Ms. Martínez saw some blocks wrapped in tape. Once she saw the tape, the officer placed Pizarro under arrest and then Ms. Martínez opened the defendant's suitcase. Ms. Martínez knew that it was identical to the first bag's contents when she opened the suitcase. She never saw the contents of the defendant's gift boxes.

Officer Avilés testified that he has been a policeman since 1974. On the day in question, he was working at the security area when two passengers went through the security checkpoint. He witnessed Ms. Martínez asking the first passenger to open the suitcase, and his saying that there were figurines inside. When the packages were opened, Officer Avilés could see that there were no figurines and that based on his experience and previous cases, that they were kilos of cocaine. The second passenger then arrived and Ms. Martínez detected something similar to what she had seen in Mr. Pizarro's suitcase and suspected it to be cocaine. At that time, Officer Avilés felt that he had probable cause to believe that it was the same. He arrested both people and took them to the police station at the airport. A Drug Enforcement Administration agent later made field tests at the station and those tests proved positive for the presence of cocaine. Officer Avilés opened the defendant's packages at the station house. It was then that he was sure that the contents of the gift wrapped packages were identical.

## II. The Magistrate's Conclusion

Magistrate Judge Arenas concluded at pages 6 and 7 of his Report and Recommendation:

It is well-settled that a warrantless search conducted incident to a lawful arrest is a

traditional exception to the warrant requirement of the Fourth Amendment. *United States v. Garcia*, [605 F.2d 349, 352 (7th Cir.1979)].

... Arresting Officer Avilés had probable cause to believe that an offense was being committed and that the defendant was in possession of contraband, cocaine, at the time of his arrest.

Therefore, I conclude that the warrantless search of the defendant's bag which contained cocaine was not a violation of the defendant's Fourth Amendment rights, *but was a search incident to his arrest.* (Emphasis added)

With utmost respect, this Court opines that the Magistrate's reliance on *Garcia* is misplaced. Rather, the Court finds that the factual-legal scenario of the instant case is more akin to that of two other circuit court cases: *United States v. $639,558.00 in U.S. Currency*, 955 F.2d 712 (D.C.Cir.1992) and *United States v. Schleis*, 582 F.2d 1166 (8th Cir.1978) (en banc).[1]

### III. The Applicable Law

It is hornbook law that warrantless searches are *per se* unreasonable unless falling within one of the few well established exceptions to the Fourth Amendment's Warrant Clause. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception is that established by the Supreme Court in *Chimel v. California*.[2] There, the Court held that in order to ensure his safety and prevent the destruction of evidence, an officer may conduct a warrantless search of the arrestee's person and the "area from within which he might gain possession of a weapon or destructible evidence." 395 U.S. at 763, 89 S.Ct. at 2040. In *United States v. Chadwick*[3], however, the Court limited the *Chimel* exception by holding that "Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to

their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of the property is no longer an incident of the arrest." 433 U.S. at 15, 97 S.Ct. at 2485.

*Chadwick* has been followed by the D.C. and Eighth Circuits in *$639,558.00 in U.S. Currency, supra*, and *Schleis, supra*, respectively, and distinguished by the Seventh Circuit in *Garcia, supra*. We shall now examine each of these four cases.

In *Chadwick*, the defendants were arrested outside a train station in Boston as they were loading a footlocker into an automobile trunk. The footlocker had previously been signaled by a canine for the presence of narcotics inside. The defendants and their footlocker, which was under the exclusive control of the police agents, were then taken to the federal building. There was no danger that whatever was inside the footlocker could be removed by the defendants. Nor was there reason to believe that the footlocker contained explosives or evidence which would lose its value unless the locker were opened at once. Also, secure storage facilities were readily available at the federal building. Nevertheless, without obtaining a search warrant, the agents opened the footlocker about an hour and a half after the arrest. Large amounts of marijuana were found inside.

Both federal district and appeal courts concluded that the marijuana should be suppressed. The Supreme Court affirmed. Although the locker had properly been taken into federal custody after the defendant's lawful arrest, and although probable cause existed to suspect that it contained a controlled substance, the Court nevertheless noted that:

In this case, important Fourth Amendment privacy interests were at stake. By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would re-

1. The defendant does not cite these cases in his objection to the Magistrate's Report and Recommendation.

2. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

3. 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

main free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause.... 433 U.S. at 11, 97 S.Ct. at 2483. The Court then concluded that the search was not carried out incident to a lawful arrest:

Here the search was conducted more than an hour after federal agents had gained *exclusive control* of the footlocker and long after respondents were *securely in custody;* the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded. (Emphasis added)

433 U.S. at 15–16, 97 S.Ct. at 2485–86.

The legally relevant facts in *Schleis* are similar to those of *Chadwick.* A federal marshal was leaving a restaurant when he saw the defendant weaving and stumbling as he walked toward the restaurant. The defendant made several unsuccessful attempts to place a call from a public telephone as fumbled the coins which he tried to insert in the slot. The marshal then approached the defendant who was leaning against the phone and clutching a combination lock briefcase. After unsuccessfully attempting to communicate with him, the marshal concluded that the defendant was under the influence of something other than liquor.

The marshal then asked the defendant to come with him. He identified himself as a fully deputized agent of the law and proceeded to read him his *Miranda* rights. He then placed the defendant's hands on the hood of an automobile and patted him down for weapons. As a result of the pat down, he discovered a small bag containing marijuana and a large amount of currency. A local police officer soon after arrived at the scene and informed the marshal that approximately a year earlier, another police officer had told him that the defendant was a narcotrafficker. The defendant was then placed under arrest and taken to the local station. A search of his clothing revealed a medicine bottle containing cocaine. Also at the station, a police officer, acting without a warrant, forced open the locked briefcase and found inside more cocaine. An evidence locker was nevertheless available at the station.

The Court of Appeals for the Eight Circuit sitting *en banc* held that the incriminating evidence found inside the briefcase was obtained in violation of the Fourth Amendment. First, the Court stated:

The contents of a briefcase are entitled to the same protection of the Fourth Amendment as the contents of a footlocker. By placing his personal effects inside a combination locked briefcase, Schleis clearly, in the language of *Chadwick,* "manifested an expectation that the contents would remain free from public examination." Moreover, Schleis retained personal possession of the briefcase, thus, manifesting an even greater expectation of privacy than if he had relinquished possession to a common carrier for shipping as in *Chadwick.* (Citations omitted)

582 F.2d at 1170. The Court further stated:

The briefcase came under the *"exclusive control"* of the police at the time of the arrest when Schleis was *handcuffed and taken into custody.* The search, however, was conducted at the Burnsville jail well after the arrest and after Schleis had been locked in a jail cell. Since an evidence locker was available in which the briefcase could have been securely placed, *there was no reason to believe that any evidence in the briefcase might be destroyed. Moreover, there was no reason to believe that the briefcase contained explosives or any other danger instrumentalities.* (Emphasis added)

582 F.2d at 1172.

In *$639,558.00 in U.S. Currency,* a quite recent civil forfeiture case, the D.C. Circuit

followed the *Chadwick* court's *ratio decidendi* in determining whether the claimant's money was subject to government forfeiture. The claimant, who was never indicted, was travelling via Amtrack from Fort Lauderdale, Florida to New York City. During the journey, an Amtrack officer noted his awkward behavior, which consisted amongst several things of his changing rooms twice during the first leg of the journey and his purchasing the ticket with cash only a few minutes before the train departed. At one of the stops, a dog sweep of the corridor by the claimant's compartment was performed. However, the canine did not alert. Later, one of the Amtrack officers, knocked on the claimant's door and identified himself. The claimant refused to consent to a search of his compartment and luggage. However, after some prodding, he agreed to permit that his luggage be sniffed. A dog was brought in and quickly reacted to two of the defendant's three bags. The claimant was arrested and removed along with his luggage from the train and driven shortly thereafter to a security office. Although there was a secure storage facility at the station, the officers decided to place the luggage in the same room with the claimant. However, he was unable to reach his bags. After contacting an Assistant United States Attorney to inquire whether a warrant was necessary to open the luggage, the AUSA informed the officers that it was not. No drugs were found inside. Instead the officers found large amounts of cash.

The D.C. Circuit concluded that forfeiture of the claimant's money was unwarranted as the search of the luggage approximately one half hour following his arrest was not carried out incident to said arrest:

> Like Judge Sporkin, we perceive no principled basis on which this case may be distinguished from *Chadwick*. Before searching [the claimant's] luggage, the officers had "reduced" the luggage "to their exclusive control." [The claimant] had been arrested and was handcuffed to a chair. The officers did not fear for their safety; there was no possibility that [the claimant] could destroy any evidence. Any need for swift action had by that time disappeared. [The claimant], like the arrestees in *Chadwick*, no longer had access to the luggage. (Citations omitted)

955 F.2d at 716.

Contrary to *Schleis* and *$639,558.00 in U.S. Currency*, the factual scenario in *Garcia* is distinguishable to that of *Chadwick*. Chicago D.E.A. agents received several tips from a reliable informant that the defendants transported heroin from Los Angeles to Chicago via airplane on a weekly basis, and that they would be arriving in two days at O'Hare Airport. The gate assigned for the arrival of their flight was thus placed under close surveillance. As passengers deplaned from said flight, a couple was identified as the suspects. The agents followed them through the concourse to the baggage area. After handing the defendant several baggage claim tickets the second suspect exited the terminal building. Several agents stopped and arrested him.

The defendant, who remained at the baggage area, picked up two suitcases from the conveyor belt and proceeded to exit the terminal. As she was walking out, an agent approached her and identified himself. The defendant became hysterical and stated "I knew I shouldn't have done this," then proceeded to urinate on her clothes. The agent then placed her under arrest and escorted her away from the flow of pedestrian traffic. Since the defendant was not handcuffed or otherwise restrained, the agent seized the two suitcases from the spot where the defendant had dropped them, and brought them within one foot of her. He then searched their contents as they were unlocked. Heroin was found inside one of the two. No more than fifteen seconds elapsed from the moment the defendant was arrested and the search of her luggage.

Relying on *Chadwick*, the defendant moved to suppress the evidence. The Court of Appeals for the Seventh Circuit however, distinguished the factual scenario of both cases:

> In *Chadwick*, the object seized was a cumbersome, two hundred pound, double-locked footlocker, which obviously could be neither quickly opened nor rapidly removed by the defendants or an accomplice

at the time of arrest. It is also significant that the search itself was not undertaken in close proximity to the time and place of the arrest, and seizure. Rather, the footlocker was opened more than one hour after it had been removed along with the defendants to the police station. Moreover, since the defendants were incarcerated, the only persons present at the time of the search were police officers. Under these circumstances, ample justification existed to delay the search until a warrant could be obtained.

The factual circumstances governing the search in the instant appeal are in marked contrast. The objects seized consisted of two hand-carried, portable suitcases *which were quite capable of being opened quickly by the defendant in order to gain access to a weapon or evidence, or removed by a waiting accomplice of the defendant. Unlike the search in Chadwick, the search in this case was undertaken immediately upon the defendant's arrest.* The officers approached the defendant as soon as she exited the baggage terminal building, placed her under arrest, seized the luggage she carried, and *undertook a search of its contents in the defendant's presence and within fifteen seconds of the announcement of the arrest.* Accordingly, the search was neither remote in time or place from the arrest, and since the police had probable cause to effect the arrest and exigent circumstances were present, the warrantless search of the contents of the luggage was justified as a search incident to arrest.... (Emphasis added)

605 F.2d at 353–54. Regarding the defendant's reasonable expectation of privacy in the luggage the circuit court further stated:

First, under the circumstances in this case, an expectation of privacy by the defendant is not "one that society is prepared to recognize as 'reasonable.'" Certainly,

the arrest of the defendant, standing alone, did not destroy whatever privacy interests she had in the contents of the suitcases. It did, however, at least for a reasonable time and to a reasonable extent, subsume those interests into the legitimate governmental interest in discovering weapons, obstructing access to means of escape, and preventing the destruction or secretion of evidence. (Citations omitted)

605 F.2d at 355.

## IV. Application of the Chadwick Doctrine to the Facts at Bar [4]

▮ We start off with the basic premise that:

The governmental interest in detecting the weapons employed in airline terrorism is great. Airplane skyjacking and bombings at airports have proliferated ... Additionally, firearms and explosives can be small and easily concealed. Their detection is difficult if limited to an inconclusive x-ray scan. The scan and subsequent search involves only a slight privacy intrusion as long as the scope of the search is limited to the detection of weapons, explosives, or any other dangerous devices, and is conducted in a manner which produces negligible social stigma. Given these circumstances, a visual inspection and limited hand search of luggage which is used for the purpose of detecting weapons or explosives, and not in order to uncover other types of contraband, is a privacy intrusion we believe free society is willing to tolerate.

*United States v. Pulido–Baquerizo,* 800 F.2d 899, 902 (9th Cir.1986). Applying this bedrock principle of search and seizure law to the case at bar, the administrative search of the defendant's luggage in order to prevent the carrying of weapons or explosives aboard an aircraft was without any doubt lawful.

---

4. This Court is aware that a recent Supreme Court case, *California v. Acevedo,* —— U.S. ——, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), somewhat erodes *Chadwick.* There, the Court held that, upon the existence of probable cause, containers found *in automobiles* may be searched without a warrant even though no probable cause exists to search the entire automobile. *Id.* at ——, 111 S.Ct. at 1991.

This Court, as has the D.C. Circuit, however, concludes that the principal holding of *Chadwick* survived the Supreme Court's weeding in *Acevedo. See $639,558.00 in U.S. Currency,* 955 F.2d at 717–18. Since no automobile is involved in this case, *Chadwick,* not *Acevedo,* applies here.

During the x-ray screening of the defendant's luggage for said purpose, the agent on duty, Ms. Martínez, detected the presence of "blocks" inside the packages inside his suitcase. The detection of such contraband as a result of a valid administrative search thus cannot be deemed unlawful. *See United States v. $124,570.00 in U.S. Currency,* 873 F.2d 1240, 1246–47 n. 6 (9th Cir.1989). In turn, Police Officer Avilés, a veteran with almost twenty years of law enforcement experience, recognized the packages as containing kilos of cocaine. He thus, in this Court's opinion, had probable cause to arrest the defendant and to seize his suitcase and contents therein, which he did. However, as shall be explained below, the search of the defendant's packages was not carried out incident to said lawful arrest.

■ Several facts elucidated at the suppression hearing are of utmost importance in order for the Court to reach its conclusion that a Fourth Amendment violation took place. We shall therefore review these. First, after being arrested, the defendant and the gentleman ahead of him who was also carrying packages containing "blocks" were both *handcuffed.* (Tr. at 7, 19, 31). Second, both Ms. Martínez and Officer Avilés testified that they had reason to believe that the content's of the defendant's suitcases were similar to those of Mr. Pizarro's. (Tr. at 12, 13, 32). Officer Avilés also testified that he concluded that the packages *contained cocaine.* (Tr. at 28). From his vast experience as a law enforcement agent, this is not an unreasonable conclusion. A corollary to this conclusion is that Officer Avilés must have simultaneously reasoned that the packages did not contain weapons, explosives nor evidence which would lose its value. Third, the packages were *wrapped.* (Tr. 13, 26, 30, 32). This makes it remotely probable that the defendant could have quickly opened them and pulled out any sort of weapon therefrom. Finally, the defendant, after being arrested, was driven to a station house approximately *five to ten minutes* away where he was incarcerated. (Tr. at 32). Before being jailed, however, his packages con-

taining cocaine were opened in his presence without a warrant. (Tr. 20, 33).

The above stated facts, when viewed in light of *Chadwick* and the *Schleis, $639,-558.00 in U.S. Currency* and *Garcia* trilogy discussed in this opinion, convince this Court that a *Chadwick*-type suppression of the cocaine is warranted. The factors prompting such suppression are as follow. *First,* no exigency existed so as to open the packages without a warrant. The x-rays showed that no weapons or explosives were inside, and the cocaine would not have deteriorated if the defendant's boxes were not opened. *Second,* the defendant and other gentleman were both handcuffed. *Third,* the suitcases (and boxes therein) were under the officer's *exclusive control.* The boxes were also wrapped so as to make it difficult for these to be quickly opened. Thus, there was no reasonable threat of fear for the officer's safety. *Cf. Garcia, supra. Fourth,* approximately fifteen minutes must have elapsed between the moment of arrest and the opening of the defendant's boxes at the airport station.[5] The precise time it took to search the boxes, however, is really of minor importance when compared to the facts that these were under the officer's exclusive control and no exigent circumstances to open them existed.

### Conclusion

This Court recognizes the important role law enforcement agents such as Officer Avilés play in the never ending crusade against crime. Drugs are truly one of the major evils which befall American society, both in Puerto Rico and in the mainland. However, certain rules of battle exist in the war against crime. The Fourth Amendment is one such rule.

In the case at bar, Officer Avilés could have easily procured a search warrant to inspect the defendant's boxes at the police station. The law required it. However, he failed to do so. As a consequence, the defendant's reasonable expectation of privacy re-

---

**5.** According to Officer Avilés testimony, it took five to ten minutes to reach the station via automobile. Add to this another five minutes to arrest the defendant and another two or three to get him inside the station.

garding the contents of his boxes was trampled upon.

In view of the fact that the defendant's Fourth Amendment rights were violated, this Court has no choice but to GRANT the instant motion to suppress.

**IT IS SO ORDERED.**

## OPINION AND ORDER ON RECONSIDERATION

■ Via opinion and order, this Court previously held that the warrantless search of wrapped packages found inside the above-named defendant's suitcase violated the Fourth Amendment. Suppression of cocaine found therein was therefore ordered. *United States v. Figueroa Cruz,* 822 F.Supp. 853 (1993). The Government now requests that the Court reconsider its ruling in light of the inevitable discovery exception to the exclusionary rule articulated by the Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Specifically, the Government contends that even if the search of the defendant's packages was unlawful, an inventory search would have nevertheless yielded their contents. Thus, there is no need to suppress the cocaine. This Court disagrees.

Our analysis of the issue raised by the Government must begin with a review of *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), the seminal decision on inventory searches of containers or articles found upon an arrestee's possession. In said case, the defendant was arrested for disturbing the peace and was taken to the police station. There, the contents of his shoulder bag were inventoried. During said search, amphetamine pills were discovered. Subsequently, the defendant was charged with violating a state controlled substance law. As expected, he moved to suppress the drugs. The trial and intermediate appellate courts ruled in his favor, and the Illinois Supreme Court denied review. After grant-

ing certiorari, the United States Supreme Court reversed the state court's ruling by holding that the inventory search conducted by the police was not *per se* unlawful:

> ... it is not "unreasonable" for police, as part of the *routine procedure incident to incarcerating an arrested person,* to search any container or article in his possession, in accordance with established inventory procedures.

*Id.* at 648, 103 S.Ct. at 2611. Part of its *ratio decidendi* was as follows:

> At the station house, it is entirely proper for police to remove property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the station house. A standardized procedure for making a list or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person.

*Id.* at 646, 103 S.Ct. at 2609.

A review of the facts of the instant case[1] convinces this Court that the defendant's packages containing cocaine could not have validly been opened and searched pursuant to a *Lafayette* inventory search.[2] The scenario in the instant case is not the *Lafayette* garden variety one where a defendant is arrested, is taken into custody, and then has his bag or suitcase inventoried so as to protect his or her belongings. Rather, in this case, the defendant's arrest and the seizure of his suitcase *were prompted by the arresting officer's suspicion that the wrapped packages inside his suitcase contained cocaine.*[3] Upon arrival at the police station,

---

1. For a detailed summary of these, the Court refers the reader to its prior opinion, *supra.*

2. In light of this conclusion, the Court need not make a determination as to whether there existed a routine inventory search procedure at the time of the defendant's arrest.

3. In its prior opinion, the Court concluded that based on this suspicion, the arresting officer indeed had probable cause to arrest the defendant and to seize his suitcase.

there was no justifiable need to open the packages pursuant to an inventory search since after lawful X-raying thereof, their contents had reasonably been inferred to a near certainty. Thus, any "inventory search" of these packages that would have been carried out could not be considered a caretaking procedure, but a pretext to search their contents. *See Lafayette*, 462 U.S. at 649, 103 S.Ct. at 2611 (Marshall, J., concurring). As a corollary thus, the Government cannot invoke the inevitable discovery doctrine.

WHEREFORE, in light of the above, the Government's motion for reconsideration (docket # 20) is hereby **DENIED. SO ORDERED.**