**UNITED STATES of America**

v.

**Richard SNAITH II.**

**Crim. A. No. 87–40–02.**

United States District Court, D. Vermont.

Aug. 7, 1987.

Charles A. Caruso, Asst. U.S. Atty., Rutland, Vt., for plaintiff.

Donald Graham, Welch, Graham & Manby, White River Junction, Vt., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BILLINGS, District Judge.

On July 24, 1987, this Court held a hearing on defendant's motion to suppress. Defendant moves to suppress all evidence discovered during a search and seizure of defendant's dwelling on June 9 and 10, 1987, prior to issuance of a search warrant. The government opposes the motion. For the reasons outlined below, the motion is DENIED.

### FINDINGS OF FACT

On June 10, 1987, defendant Richard Snaith II was arrested by members of the Vermont Drug Task Force (DTF) and charged with conspiracy to distribute and possess with the intent to distribute co-

caine. The arrest was the culmination of an undercover operation by Detective Roger Marcoux, supervised by Drug Enforcement Agent James Sullivan.

On May 8, 1987, Detective Marcoux purchased two ounces of cocaine from a Reginald Spooner in Hartland, Vermont. At that time Spooner identified defendant Snaith's residence as his supplier's house. Subsequently, on June 9, 1987, Marcoux arranged with Spooner to buy another four ounces of cocaine. To enact the deal Marcoux and Spooner drove to Hartland, Vermont, arriving between 2:00 and 2:30 p.m. DTF agents commenced a surveillance of defendant and his residence, as well as of Detective Marcoux and Spooner. Defendant was not home when Marcoux and Spooner arrived, but eventually after a series of phone calls and finally a meeting between Spooner and Snaith, Spooner announced that he could only bring Marcoux a sample before payment. The remainder of the four ounces of the cocaine would be left in defendant's garage, where Spooner would exchange the money for the drugs. During the afternoon, the DTF agents on surveillance observed defendant enter and leave his residence several times, including once to meet Spooner.

After Spooner met with Snaith and the deal was set, Marcoux was forced to arrest Spooner, as he had no authorization to provide the required amount of money. Snaith returned to his residence after the meeting, but shortly left again. Spooner was unable to contact anyone at the time, nor was there any evidence that any interested person observed the arrest. Agent Sullivan, fearing that there might be other conspirators in the house who might destroy the cocaine if Spooner did not show up to consummate the deal, ordered his officers to secure defendant's residence and garage, although he knew that defendant had driven away a while earlier.

At approximately 6:30 p.m. on June 9, 1987, the DTF agents entered the house and garage to secure the property, satisfied themselves that no one was present, and then awaited the issuance of a search warrant. Meanwhile, Detective Brent Cur-

tis, who had entered and secured the garage, began to examine his surroundings. He concluded that the drugs Spooner was to pick up were probably hidden in some loose insulation in the ceiling or some boxes to the left of the door, so he moved toward the right rear of the garage, resolved to avoid disturbing that possible evidence. His resolution failed, however. Out of "idle curiosity" he noticed a tire on a shelf covered with plastic. He reached inside the plastic to the middle of the tire, picked out a Tupperware container, and removed the lid. Inside, he discovered a red bandana which concealed a plastic bag filled with a white powder, later identified as cocaine. After viewing the contents of the bag, he replaced the items as he had found them and informed Sullivan what he had done. Shortly thereafter, Agent Sullivan contacted Assistant U.S. Attorney Robert O'Neil, with whom he had been discussing the progress of the case and the warrant requirements throughout the day, to commence obtaining a search warrant. Later in the day Snaith returned home and was arrested. Agents remained in the house until the following afternoon when the search warrant was finally issued and various evidence, including the Tupperware from the garage, was seized.

## DISCUSSION

The Fourth Amendment to the U.S. Constitution protects the right of the people to be secure from "unreasonable searches and seizures" and provides that warrants shall be issued only upon probable cause and only when stated with particularity. Neither party disputes that federal agents entered and remained in defendant's residence for approximately twenty hours until a search warrant was obtained. They disagree on the characterization and consequences of this action. The government maintains that its agents engaged in no unreasonable search or seizure and therefore all the evidence found in the house and garage is admissible. Defendant asserts that the government acted unconstitutionally and as a result all the evidence uncovered during the security check *and* execution of the search warrant should be suppressed. The issue before the Court can be

broken down into two questions: were the government's actions unconstitutional, and, if so, should the evidence be suppressed?

### A. Constitutionality of Securing the Property

In *United States v. Segura,* 663 F.2d 411 (2d Cir.1981), *aff'd,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Second Circuit faced a similar situation.[1] After receiving information that co-defendants Segura and Colon were involved in cocaine trafficking, the New York Drug Enforcement Task Force (DETF) began surveillance on defendants and their apartment. At 11:15 p.m. Segura was arrested in the lobby of the building, then taken upstairs, where DETF agents entered the apartment. The agents then conducted a security check of the apartment,[2] in the process noting drug paraphernalia in plain view, and eventually arrested Colon and the other inhabitants of the apartment. Two agents remained in the apartment until a search warrant was obtained the following evening.

The Second Circuit found that the warrantless entry into defendants' apartment was unjustified. *Segura,* 663 F.2d at 414. The Court found that the DETF could not have had a reasonable belief that anyone was in the apartment or that evidence might be destroyed if they did not secure the premises immediately after Segura's arrest. They had maintained surveillance on the apartment and seen no movement for several hours. Also, Segura had been unable to contact anyone, nor could any resident of the apartment have seen his arrest.

■ The situation here is even more clearly unjustified. The DTF agents had observed Snaith leave the premises and had not recently seen any sign of another person around. They had no reason to believe that any evidence would be destroyed. Spooner's arrest had occurred some distance from the residence, and it was unlikely any occupants could have learned of the arrest and then destroyed the evidence, especially as the cocaine itself was supposed to be in the open garage. Therefore, the DTF could not have had a reasonable belief that third persons were inside and would destroy evidence; without that reasonable belief their entry was unjustified. *Id.; U.S. v. Agapito,* 620 F.2d 324, 336 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). As the entry was unjustified, the security check was an unreasonable search within the Fourth Amendment and an unconstitutional act.

Determining that the DTF's entry into Snaith's residence and garage was unconstitutional is not the end of our inquiry. Next, we must turn to the question of whether the evidence obtained from the residence and garage should be excluded.

### B. Suppression of the Evidence

■ The *Segura* case was appealed to the U.S. Supreme Court. In its opinion the Supreme Court determined that even if the government's original entry was unconstitutional, the evidence later obtained pursuant to the search warrant was not excludable because "[h]ad the police never entered the apartment, but instead conducted a perimeter stakeout to prevent anyone from entering the apartment and destroying evidence, the contraband now challenged would have been discovered and seized precisely as it was here." *Segura v. U.S.,* 468 U.S. 796, 814, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599 (1984). The Court based its conclusion on the fact that the police had an independent source for discovery of this evidence. They had sufficient information before entering the apartment that the seized evidence was inside. In other words, they did not discover the evidence solely because of their illegal entry. The evidence found in executing the search warrant was therefore not "fruit" of the "poisonous tree", the illegal seizure, but of an independent source. *Id.*

---

1. The Supreme Court did not address the issue of the constitutionality of the government's security check because it was not raised on appeal. 468 U.S. 796 at 798, 804, 104 S.Ct. 3380 at 3382, 3385.

2. A security check is "a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers." *U.S. v. Agapito,* 620 F.2d 324, 335 (2d Cir.), cert. denied, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

The same is true here of the evidence obtained in defendant's house. The DTF had independent information from Marcoux's undercover operation of probable evidence in the house. Although the entry and seizure of the premises was illegal, the evidence, which was not searched for nor seized until after the search warrant was issued, was not "fruit" of the "poisonous tree," but of Marcoux's independent information. Therefore, *Segura* mandates that it not be excluded.

■ The Tupperware container in the garage is a different matter. Detective Curtis did both seize and search this item before the warrant was issued. Only another exception to the exclusionary rule can save this evidence from exclusion. That exception is the inevitable discovery rule: "When, as here, the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Nix v. Williams*, 467 U.S. 431, 448, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984).

In *Nix v. Williams* the Supreme Court adopted the inevitable discovery rule, although the case involves the Sixth Amendment right to counsel, rather than the Fourth Amendment. While a search was progressing for a murder victim's body, a police officer who was transporting the defendant, the suspected murderer, obtained from him a confession, including the location of the body, in violation of the defendant's right to counsel. The Court refused to suppress the evidence of the body, however, because the government showed that even without the coerced confession they would have found the body soon. The police officer's misconduct did nothing to taint the integrity of the evidence as it would have been obtained lawfully anyway. *Id.* at 446, 104 S.Ct. at 2510. Further, the Court reasoned, to suppress the evidence would not place the parties in the same position they would have been in had the misconduct not occurred; suppression would put the State in a *worse* position, as it would be without evidence it would have lawfully obtained without the misconduct. *Id.* at 447, 104 S.Ct. at 2510. Therefore, the Court concluded, evidence that would inevitably have been discovered absent police misconduct is admissible even if police misconduct does occur.

That same rationale applies here. Detective Curtis clearly stepped over the line of reasonable police behavior. As we have established already, the entry itself was unjustified. To further trample on defendant's constitutional rights by poking through his personal belongings out of "idle curiosity" is outrageous behavior for a trained law enforcement officer. Unfortunately, we cannot offer defendant any remedy for this violation. We are constrained by the Supreme Court's holding in *Nix v. Williams:* if evidence would inevitably have been discovered without reliance on the police misconduct, that evidence is admissible. Further, the Second Circuit's holding in *United States v. Pimentel*, 810 F.2d 366 (2d Cir.1987),[3] directs us to apply the *Nix v. Williams* rationale to this Fourth Amendment setting.

Although the government presented no explicit testimony of the actual extent of their search of the garage, we do not doubt

---

**3.** *Pimentel* involved a Defense Department audit in which certain letters were uncovered before the auditor legally could discover them. The district court attempted to take the letters out of *Nix* by distinguishing the direct and indirect products of an illegal search and seizure. 810 F.2d at 368. The Second Circuit rejected that view, holding that both direct and indirect products come within the inevitable discovery rule. *Id.* The Court elaborated on the *Nix* rationale by explaining that because the auditor would have uncovered the letters legally, admitting them would not encourage Fourth Amendment abuse. Auditors or police would not risk possible suppression, just to get evidence sooner than they could do so anyway. *Id.* at 369. We are not convinced by this rationale, but we are constrained to follow the Court's holding. If the police can violate an individual's constitutional rights just because they have independent information of its existence or because they would inevitably have found the evidence anyway, they have no motivation to honor the constitutional rights of citizens. The inevitable discovery rule, as promulgated by the courts, permits police officers to apply for a search warrant and then proceed with the search, knowing that although their search is illegal, its fruits will not be suppressed because they would inevitably have been discovered upon execution of the warrant. This rule, we believe, clearly vio-

that the DTF would have found this evidence during its search. They had information that the cocaine was in the garage and certainly would have done a thorough search for it. Detective Curtis's testimony indicates that the container was not difficult to notice and was obviously out of place. Although defendant argues that Curtis's testimony demonstrates that the loose insulation was a more likely target for a search, we are convinced that once the agents had failed to find the expected drugs there, they would have instituted a thorough search of the building.[4] Therefore, we are constrained to find that this evidence would inevitably have been discovered and is admissible despite the clear constitutional violations by the government. Had the DTF not applied for a search warrant almost simultaneously to engaging in the illegal search,[5] this would be a different case. Because the officers here merely "jumped the gun", however, we may not suppress the evidence they would have uncovered anyway. Defendant's motion to suppress is therefore DENIED.

SO ORDERED.

lates the spirit, if not the letter, of the Fourth Amendment warrant provision. However, we are constrained to follow the rulings of the Second Circuit and the Supreme Court.

4. For other inevitable discovery cases with similar facts, see *United States v. Merriweather,* 777 F.2d 503 (9th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1497, 89 L.Ed.2d 898 (1986) (although agent illegally entered defendant's motel room and found stolen money in toilet tank, evidence not suppressed because would have been found pursuant to search warrant); *United States v. Levasseur,* 620 F.Supp. 624 (E.D.N.Y. 1985) (guns discovered in footlocker before search warrant issued are admissible).

5. Defendant argues that the DTF's failure to apply for a search warrant until after the entry and the discovery of the Tupperware container negates application of the inevitable discovery rule. He cites us to cases in two circuits that require that the government be actively pursuing the alternate line of investigation at the time of the misconduct before the rule may apply.

*See United States v. Cherry,* 759 F.2d 1196, 1206 (5th Cir.1985); *United States v. Satterfield,* 743 F.2d 827, 846 (11th Cir.1984). However, in both cases the police engaged in long, extensive searches prior to seeking a warrant. Here, the DTF had discussed the necessity of the warrant with the Assistant U.S. Attorney before the constitutional violation and had directed him to pursue obtaining the warrant immediately after securing the premises. Although the Second Circuit has not specifically ruled on this issue, we are certain that it will follow the First Circuit's position. In *United States v. Silvestri,* 787 F.2d 736 (1st Cir.1986), the First Circuit engaged in an extensive analysis of this issue. The Court concluded that a flexible test was required that enabled the Court to evaluate all the circumstances. It ruled that where probable cause was clearly established before the violation and a warrant was applied for soon after securing the premises, the inevitable discovery rule must apply. This rationale seems consistent with the reasons behind the Supreme Court's decision in *Nix,* and, therefore, we believe the Second Circuit would follow this approach.