971 F.2d 854
 70 A.F.T.R.2d 92-5404, 92-2 USTC P 50,458
 UNITED STATES of America, Appellee,
v.
Shu Yan ENG, also known as Ah Shu; Cho-Kuen Wong; King
Albeo Kong; Foo Wing Yam; Sue Sang Ong; Hon
Keung Ng, Defendants,
Shu Yan ENG, also known as Ah Shu, Defendant-Appellant.
 No. 1151, Docket 91-1683.
 United States Court of Appeals,
Second Circuit.
 Argued April 2, 1992.
Decided July 28, 1992.
 
 Faith E. Gay, Asst. U.S. Atty., New York City (Andrew Maloney, U.S. Atty., Eastern District of New York, Susan Corkery, Asst. U.S. Atty., New York City, of counsel), for appellee.
 Margaret E. Alverson, New York City (Herbert V. Larson, Jr., New York City, of counsel), for defendant-appellant.
 Before MINER and McLAUGHLIN, Circuit Judges, and MARTIN, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Defendant-appellant Shu Yan Eng appeals from a judgment of conviction entered in the United States District Court for the Eastern District of New York (Glasser, J.) on November 13, 1991. Eng was convicted, after a jury trial, of tax evasion for the tax years 1986 through 1988, see 26 U.S.C. § 7201. The district court sentenced Eng to a term of imprisonment of 48 months but granted Eng bail pending this appeal. The conviction followed the district court's denial of Eng's motion to suppress certain records obtained by the government in an unlawful search and other evidence claimed by Eng to have been derived from materials discovered in the unlawful search.
 
 
 2
 The district court based its denial of Eng's motion on the "inevitable discovery" doctrine, recognized by the Supreme Court in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), as an exception to the exclusionary rule. Eng contends that the government failed to meet its burden under Nix of proving by a preponderance of the evidence that absent the unlawful search, lawful discovery of the challenged evidence was inevitable. Specifically, Eng argues that the government's version of what evidence would have been discovered absent the search is too speculative, and that our ruling in United States v. Roberts, 852 F.2d 671 (2d Cir.), cert. denied, 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988), prohibits the government from relying on the use of subpoenas in meeting its burden of proof.
 
 
 3
 Our consideration of the issues presented by this case is hindered by the lack of specific factual determinations by the district court. Accordingly, we vacate the judgment of conviction and remand this case to the district court for particularized findings as to the manner in which, if at all, each piece of evidence challenged by Eng, and said by the government to be admissible under the inevitable discovery exception, would have been inevitably discovered.
 
 BACKGROUND
 I. Events Prior to the Unlawful Search
 
 4
 In February 1989, Eng came under investigation by the Drug Enforcement Administration and the Internal Revenue Service ("IRS") for suspected narcotics and money laundering violations. The investigation began after informants indicated that Eng was importing large quantities of narcotics from the Far East and laundering money through various businesses and properties in the United States. As is customary following commencement of narcotics and money laundering investigations, the IRS began a tax evasion investigation of Eng in August or September 1989. The investigation was conducted by IRS Agent Thomas Interdonato. Interdonato used the "expenditures method" of proof, which premises a tax evasion case on a comparison between the taxpayer's income and non-taxable resources, such as gifts and loans, and the taxpayer's expenditures. The government is constrained under this method to show that non-taxable sources of funds spent by the taxpayer did not exist, a burden that involves a thorough search of assets, sources of money, and cash inflows and outflows. See generally United States v. Bianco, 534 F.2d 501 (2d Cir.), cert. denied, 429 U.S. 822, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). Prior to the unlawful search, the following items had been identified by Interdonato:
 
 A. Eng's Personal Bank Accounts
 
 5
 It appears that Interdonato began his investigation with Eng's personal tax returns, which were prepared by Wang F. Luk, an accountant. The interest income information reported on Eng's tax returns indicated that Eng had personal bank accounts in New York at Manhattan Savings Bank, Hang Seng Bank, National Westminster Bank, and Bowery Bank. However, Interdonato had no account numbers. Bowery Bank was subpoenaed for account records but responded (erroneously, as it later turned out) that it had no account for Eng.
 
 B. 134 Gauldy Avenue
 
 6
 Eng's tax returns indicated that Eng resided at 134 Gauldy Avenue, in Staten Island, New York. As regards this property, Interdonato performed a title search which revealed the identity of a mortgagee, Long Island Savings Bank. In response to a subpoena, the mortgagee produced Eng's mortgage application, payment history and the amount due on the mortgage.
 
 C. 141 Division Street
 
 7
 Interdonato had confidential information that Eng owned a condominium at 141 Division Street in New York City.
 
 D. 26 Bowery and Chinese Moon
 
 8
 The government possessed confidential information that Eng was President of Chinese Moon Palace Restaurant, Inc., located in the 26 Bowery building in New York City. Interdonato performed a title search on the 26 Bowery building and discovered that the building had been sold in December 1986, by a corporation called 26 Bowery Corp., to a corporation called Bowery Mansion, Inc. The title search also revealed that the selling corporation's attorney was Ronald De Petris, Esq., and that Eng was President of Bowery Mansion. Interdonato then obtained the certificate of incorporation and tax returns for Bowery Mansion, and the corporate tax returns for Chinese Moon, which confirmed much of the foregoing information. The Chinese Moon tax returns listed a bank account at National Westminster Bank. Interdonato subpoenaed National Westminster Bank for Chinese Moon account records, obtaining monthly statements and information on deposits. These documents showed that cashier's checks, totalling $140,000 and issued by Hang Seng Bank, had been deposited to Chinese Moon's account in June and September of 1987. Through the government's Treasury Enforcement Communication System, Interdonato further learned of two large cash deposits of $20,000 and $12,000 to Chinese Moon's account.
 
 II. The Unlawful Search
 
 9
 On October 18, 1989, about two months after the commencement of Interdonato's investigation, Eng was arrested in connection with an indictment charging him with administering a continuing criminal enterprise, money laundering, and a variety of narcotics violations. Eng was not charged with tax evasion at that time. On the date of Eng's arrest, authorities seized the 26 Bowery building, as well as one of Eng's businesses, the French Ice Cream Parlor, located on Mott Street in New York City. Eng's personal safe in the French Ice Cream Parlor was searched without a warrant, and a variety of materials was seized from the safe. The government concedes that the search was unlawful.
 
 
 10
 The materials seized from the safe included: (A) cancelled checks and other documents containing the account numbers of Eng's personal bank accounts at Manhattan Savings Bank, Hang Seng Bank, National Westminster Bank and Bowery Bank; (B) customer records of money orders payable to Long Island Savings Bank, the money orders having been used by Eng to make mortgage payments on the 134 Gauldy Avenue home; (C) documents relating to the 141 Division Street condominium, revealing among other things the condominium unit number; (D) documents relating to the purchase of the 26 Bowery building, and showing that Sol Leitner and Frieda Grant were the owners of 26 Bowery Corp. (the seller of the 26 Bowery building); (E) the National Westminster Bank checkbook of a corporation called World Express International, Inc.; (F) documents evidencing Eng's ownership of a boat and a home at 15 Collingwood Lane, in Palm Coast, Florida; and (G) additional customer records of money orders, these money orders having been used by Eng to pay a variety of expenses.
 
 III. Events Subsequent to the Unlawful Search
 
 11
 In the months following the search of Eng's safe, Interdonato:
 
 
 12
 (A) subpoenaed the banks at which Eng maintained personal accounts, and thereby obtained statements and records for the accounts;
 
 
 13
 (B) performed a title search on the 141 Division Street condo. The title search revealed the identities of the seller and seller's attorney, who were then subpoenaed by Interdonato. These subpoenas produced documents showing that Eng had purchased the condo in December 1988 for $200,000 cash;
 
 
 14
 (C) subpoenaed the principals of 26 Bowery Corp. and its attorney, and received closing documents relating to the sale of the 26 Bowery building. Another subpoena was issued to Frank Lam, one of Eng's corporate lawyers, who produced checks used to pay 26 Bowery Corp. in the transaction. The total mix of information revealed that Bowery Mansion paid $1.7 million for the 26 Bowery building, half of which was paid in cash, and half of which was financed by a mortgage given to 26 Bowery Corp. by Bowery Mansion;
 
 
 15
 (D) subpoenaed Hang Seng Bank, the source of the cashier's checks deposited to Chinese Moon's National Westminster Bank account. Documents produced by Hang Seng revealed that the cashier's checks originated with parties in Hong Kong;
 
 
 16
 (E) subpoenaed National Westminster Bank for records relating to World Express. This subpoena provided Interdonato with information that between August and November 1986, and again in September 1987, cashier's checks were deposited and wire transfers made into the World Express account, from Wing Lung Bank, Kwantung Provincial Bank, and the Bank of Credit and Commerce International. These transfers totaled about $1 million. Interdonato in turn subpoenaed these three banks, receiving records on how, when and by whom the cashier's checks were purchased and the wire transfers made. The records indicated the source of funding for World Express to be parties in Hong Kong. It also became evident that World Express had purchased Bowery Mansion prior to Bowery Mansion's purchase of the 26 Bowery building, and was the ultimate principal behind the 26 Bowery building;
 
 
 17
 (F) performed a title search on the Florida home, which revealed the identities of the seller, the seller's attorney, the real estate broker and the broker's bank. Records produced in response to subpoenas revealed that Eng had purchased the Florida house in December 1986, for about $153,000 in cash, cashier's checks, and money orders. Interdonato also determined, from Florida's Department of Natural Resources, that Eng had purchased his boat from the Flagler County Marina. The Marina and the Marina's bank were subpoenaed, revealing that Eng purchased the boat in April 1987 for $43,730 in cash and money orders.
 
 IV. Eng's Conviction for Tax Evasion
 
 18
 In April 1990, about six months after the search of the safe and eight months after Interdonato's investigation began, a superseding indictment added to the existing charges against Eng three tax evasion counts relating to the tax years 1986 through 1988. The evidence the government sought to introduce at trial in connection with the tax evasion charges included:
 
 
 19
 (1) the bank statements and records of Eng's personal bank accounts, obtained by post-search subpoenas from Eng's banks;
 
 
 20
 (2) the customer records of the money orders, obtained in the search of the safe, used to pay Long Island Savings Bank (the mortgagee of the 134 Gauldy Avenue property);
 
 
 21
 (3) the documents relating to the 141 Division Street condo, obtained by post-search subpoenas;
 
 
 22
 (4) the documents relating to the purchase of the 26 Bowery building, obtained by post-search subpoenas;
 
 
 23
 (5) the records relating to the National Westminster Bank account of Chinese Moon, obtained by subpoena prior to the search;
 
 
 24
 (6) the records relating to the source of the cashier's checks deposited into, and wire transfers made to, the National Westminster Bank accounts of World Express and Chinese Moon, obtained by post-search subpoenas;
 
 
 25
 (7) the documents relating to the Florida home and boat, obtained by post-search subpoenas; and
 
 
 26
 (8) the other customer records of money orders used by Eng to pay a variety of expenses, and obtained in the search of the safe.
 
 
 27
 This evidence in large part formed the basis for the government's claim that Eng was spending money in excess of his taxable income, that Eng lacked non-taxable sources of the monies being spent, and that Eng had not reported taxable income of about $118,000 in 1986, $39,000 in 1987, and $205,000 in 1988.
 
 
 28
 Eng moved to suppress the evidence, arguing that it was either seized in the unlawful search of the safe, or was the product of materials seized from the safe. In denying Eng's motion, and allowing admission of all the challenged evidence, the district judge stated that "I have no difficulty in concluding the inevitable discovery doctrine is clearly applicable here in my view," and that "I have no question in my mind what my conclusions are. I have gone through Nixon [sic] versus Williams and the other cases with great care and I am satisfied that the inevitable discovery principle will apply." The district judge initially indicated that he would provide a "rather lengthy" opinion to support his conclusions. However, the judge later decided not to issue the promised opinion because, in his view, the "inevitable discovery doctrine [gave] rise to a conclusion which I thought was compelled" under the circumstances. He did not elaborate further on any aspect of the evidence challenged by Eng, or explain what "compelled" his conclusion that each item of evidence inevitably would have been discovered lawfully absent the search. After a jury trial, Eng was convicted of the tax evasion charges, but was acquitted of the continuing criminal enterprise, money laundering and narcotics charges.
 
 DISCUSSION
 I. The Inevitable Discovery Doctrine
 
 29
 The exclusionary rule generally prohibits admission at trial of evidence seized in searches deemed unreasonable under the Fourth Amendment, see Weeks v. United States, 232 U.S. 383, 398, 34 S.Ct. 341, 346, 58 L.Ed. 652 (1914), as well as of derivative evidence acquired as an indirect product or result of the unlawful search, see Wong Sun v. United States, 371 U.S. 471, 484-88, 83 S.Ct. 407, 415-17, 9 L.Ed.2d 441 (1963). The Supreme Court has long emphasized, however, that the exclusionary rule does not automatically render all evidence gained in or as a result of an unlawful search forever "sacred and inaccessible," Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920).
 
 
 30
 The doctrine of inevitable discovery, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine is related to, and is "an extrapolation from," the independent source doctrine, another exception to the exclusionary rule. See Murray v. United States, 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988). For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent the government misconduct. See id.; see also Nix, 467 U.S. at 448, 104 S.Ct. at 2511.
 
 
 31
 The Supreme Court has stated that proof of inevitable discovery "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment and does not require a departure from the usual burden of proof at suppression hearings." Nix, 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5 (emphasis added). Indeed, the facts of cases applying the inevitable discovery doctrine suggest that proof of inevitability is made more convincing when the areas of the search or investigation are well-defined, the government effort is planned and methodical, and a direct causal relationship and reasonably close temporal relationship exist between what was known and what had occurred prior to the government misconduct and the allegedly inevitable discovery of the evidence. See, e.g., Nix, 467 U.S. at 448-50, 104 S.Ct. at 2511-12 (discovery of body in culvert inevitable because 200 volunteers actively were searching culverts for the body, one search team was only a few miles away from the body at the time of unlawful confession, area in which the body was found was the next to be searched, and testimony indicated that absent the confession body would have been found in no more than five hours); United States v. Whitehorn, 829 F.2d 1225, 1231 (2d Cir.1987) (discovery inevitable where warrant application for search of apartment was being prepared well before unlawful search of apartment, and "overwhelming probable cause" existed without reference to anything discovered in apartment), cert. denied, 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988); United States v. Pimentel, 810 F.2d 366, 367-69 (2d Cir.) (discovery of letters from subcontractor to contractor inevitable because "ongoing" audit and search of contractor's files "surely" would have uncovered the letters).
 
 
 32
 II. The Role of Subpoenas in Inevitable Discovery Analysis
 
 
 33
 In United States v. Roberts, 852 F.2d 671 (2d Cir.), cert. denied, 488 U.S. 993, 109 S.Ct. 556, 102 L.Ed.2d 583 (1988), the government had issued a grand jury subpoena for certain documents obtained months later during an unlawful search. The government claimed that the documents inevitably would have been discovered due to the outstanding subpoena. In rejecting this argument, we said:
 
 
 34
 The mere fact that the government serves a subpoena, however, does not mean that it will obtain the documents it requests. A subpoena can be invalid for a variety of reasons, as when it is unduly burdensome, Fed.R.Crim.P. 17(c), when it violates the right against self-incrimination, United States v. Doe, 465 U.S. 605, 610-12[ ] [104 S.Ct. 1237, 1241-42, 79 L.Ed.2d 552] (1984), or when it calls for privileged documents. In re Grand Jury Subpoena Dated Sept. 15, 1983, 731 F.2d 1032, 1036-37 (2d Cir.1984). Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena.
 
 
 35
 Id. at 676; see also Center Art Galleries-Hawaii, Inc. v. United States, 875 F.2d 747, 754-55 (9th Cir.1989) (following Roberts ). In this case, the information derived from subpoenas plays a significant role in the government's claim that the evidence challenged by Eng inevitably would have been discovered absent a search of the safe. Eng contends that Roberts per se forbids the government from using the subpoena power to make its inevitable discovery case.
 
 
 36
 Contrary to Eng's contention, we did not hold in Roberts that the subpoena power never may be relied upon by the government to meet the inevitable discovery burden of proof. The subpoena power conferred upon the government under the rules of criminal procedure, see Fed.R.Crim.P. 17, serves important purposes as an investigative tool and as a method of obtaining evidence. The per se prohibition urged by Eng would conflict with the Supreme Court's requirement that the exclusionary rule, and the inevitable discovery exception, should not be employed so as to place the government in a worse position than it would have been in had no unlawful search occurred. See Nix, 467 U.S. at 443-44, 104 S.Ct. at 2509. Nor did we decide in Roberts, as the government seems to suggest, that there was some particular reason to suspect that the subpoena issued in that case was invalid.
 
 
 37
 Rather, we held in Roberts that the "mere fact" of an outstanding subpoena apparently dormant for "several months before" the unlawful search, and having no prospect of producing results, was an insufficient basis for concluding that discovery of the evidence was inevitable. See Roberts, 852 F.2d at 676. The circumstances revealed in Roberts, which made it unlikely that the subpoena would produce any evidence, must be contrasted with a situation where the government can demonstrate a substantial and convincing basis for believing that the requisite information would have been obtained by subpoena. Where the government is able to make such a demonstration, there is no reason why the government may not rely upon the subpoena power as one way it might meet the burden of proving inevitable discovery by a preponderance of the evidence. However, the various factors that might prevent a positive response to a subpoena must also be considered. See id.
 
 
 38
 In view of the need to prevent the inevitable discovery exception from swallowing the exclusionary rule, special care is required on the part of a district court when the government relies on the subpoena power. While we decline to draw a bright line, it is essential that there be a substantial degree of directness in the government's chain of discovery argument, rather than a hypothesized "leapfrogging" from one subpoena recipient to the next until the piece of evidence is reached. Further, the government must show that both issuance of the subpoena, and a response to the subpoena producing the evidence in question, were inevitable. Particular care is appropriate where, as here, subpoenas are issued after or at the time of the unlawful search, an issue that Roberts did not present. We share the Ninth Circuit's view that subpoenas must not serve as an after the fact "insurance policy" to "validate" an unlawful search under the inevitable discovery doctrine. See Center Art Galleries, 875 F.2d at 755.
 
 
 39
 III. Particularized Findings Required on Remand
 
 
 40
 As the previous discussion of Nix and other inevitable discovery cases indicates, inevitable discovery analysis logically must begin with the progress of the investigation at the time of the government misconduct. This point of departure is fixed by the requirement that an inevitable discovery inquiry focus on "demonstrated historical facts" so as to keep speculation to an absolute minimum, see Nix, 467 U.S. at 444 n. 5, 104 S.Ct. at 2509 n. 5, although by its nature inevitable discovery analysis inevitably involves some degree of speculation. The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred.
 
 
 41
 Our initial concern is the possibility that the government's tax evasion investigation was not sufficiently active or developed prior to the search of Eng's safe to support the government's broad claim of inevitable discovery. Only a few months passed from the beginning of Interdonato's investigation until the search of Eng's safe. Many important sources of evidence were not sought out until after the search of Eng's safe, and Interdonato's information prior to the search of the safe was not very detailed or comprehensive in relation to what later was admitted against Eng. The search of the safe provided a great deal of specific financial information about Eng, and only thereafter was the indictment amended to include tax evasion.
 
 
 42
 We have suggested that investigations "trigger[ed]" or "catalyzed" by information unlawfully gained become tainted. See United States v. Falley, 489 F.2d 33, 41 (2d Cir.1973); United States v. Cole, 463 F.2d 163, 173-74 (2d Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). Similarly, in Pimentel, we took specific note that the audit of the contractor's files was active and ongoing at the time of the government misconduct in that case, and declined to adopt a "flexible test" allowing the government to meet its burden of proof without showing that an "alternate line of investigation [was] being actively sought or pursued at the time of the government misconduct." Pimentel, 810 F.2d at 369. We agree with the Fifth Circuit's observation that:
 
 
 43
 [T]he alternate means of obtaining the evidence must at least be in existence and, at least to some degree, imminent, if yet unrealized. If the inevitable discovery exception can be applied only on the basis of the [government's] mere intention to use legal means subsequently, the focus of the inquiry would hardly be on historical fact.
 
 
 44
 United States v. Cherry, 759 F.2d 1196, 1205 n. 10 (5th Cir.1985), cert. denied, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987).
 
 
 45
 The government claims that pursuit of most sources deliberately was delayed until after Eng's arrest so as not to alert Eng, and that pre-search subpoenas were issued only when the government was certain that the subpoena recipient would maintain the matter in confidence. However, there is no obvious reason why Bowery Bank, subpoenaed prior to the unlawful search for Eng's personal account records, would have been more likely to maintain confidence than the other commercial banks subpoenaed after Eng's arrest for the same type of records. Moreover, it is not apparent why National Westminster Bank, which was subpoenaed prior to the search for Chinese Moon records but after the search for Eng's personal account records, would have been better able to keep the first subpoena in confidence than the second. It also appears that some weeks passed between the search of the safe and the issuance of some of the subpoenas. Delays of this kind are not fully consistent with the suggestion that the government was informed and ready to move as soon as Eng was arrested and the risk of flight removed.
 
 
 46
 If the evidence demonstrates that an active and ongoing investigation of Eng of the kind we have required was in progress at the time of unlawful search, the district court's next task must be to consider each piece of evidence challenged by Eng and claimed by the government to be admissible under the inevitable discovery exception. The district court must, for each particular piece of evidence, specifically analyze and explain how, if at all, discovery of that piece of evidence "would have been" more likely than not "inevitable" absent the search of Eng's safe, see Nix, 467 U.S. at 444, 104 S.Ct. at 2509. This task requires the district court to determine what would have happened had the government misconduct never occurred, in light of what the government knew and was pursuing at the moment before the unlawful search, and other relevant facts and circumstances.
 
 
 47
 That a piece of evidence in fact was found after the search of Eng's safe does not necessarily indicate that its discovery was inevitable at the time of the search. Cf. Wong Sun, 371 U.S. at 484, 83 S.Ct. at 415 (rejecting proposition "that a search unlawful at its inception may be validated by what it turns up") (citations omitted). Similarly, Interdonato's testimony as to what he would have done or how he would have behaved, while deserving of careful consideration as part of the analysis, is not necessarily conclusive on the question of whether a particular piece of evidence inevitably would have been found through lawful means had Eng's safe never been searched, or even on subsidiary questions such as whether a subpoena would have been issued and what evidence the subpoena would have produced. An objective analysis is required.
 
 
 48
 As we indicated, we are unable fully to consider the issues presented in this case because the specific reasoning behind the district court's belief that every item of challenged evidence was admissible under the inevitable discovery doctrine is unknown. In this connection, we set forth some of our concerns as they relate to specific assets:
 
 A. Eng's Personal Bank Accounts
 
 49
 Prior to the search of Eng's safe, Interdonato had only the names of the banks at which Eng had personal accounts. The search of the safe provided the account numbers presumably used in Interdonato's post-search subpoenas. An important question is to what extent possession of an account number makes more likely a satisfactory response to a bank subpoena, a point on which Interdonato's testimony appears to be contradictory. We note that Bowery Bank, the only bank subpoenaed for personal account records prior to the search of Eng's safe, returned its subpoena without producing any information.
 
 B. 134 Gauldy Avenue
 
 50
 With respect to the customer records of the money orders used by Eng to pay Long Island Savings Bank, the mortgagee of the 134 Gauldy Avenue property, the government's chain of inevitable discovery appears to be as follows: Eng's bank account records showed that Eng was not paying the mortgage from his checking accounts; Interdonato had confidential information prior to the unlawful search that Eng was using money orders to pay many expenses; and therefore discovery of the money orders was inevitable because the government's next step in light of this information would have been to obtain the Long Island Savings Bank's deposit items, presumably by subpoena, which would have turned up the money orders. However, this chain of reasoning presumes that lawful discovery of the bank account records themselves was inevitable, a point which is not all that clear. Additionally, Interdonato's testimony is conflicting as to whether he had information prior to the search of the safe that Eng was using money orders to pay for expenses.
 
 
 51
 Interdonato seems to indicate in his testimony that in order to discover money orders such as those used by Eng to pay Long Island Savings Bank, one must know where and on what date the money orders were deposited after receipt by the payee. The record is unclear as to whether Interdonato possessed, or specifically how he would have acquired, any of this information (if indeed it is important) with respect to the money orders used by Eng to pay Long Island Savings Bank. Indeed, similar questions seem to exist with respect to discovery of all the various money orders admitted against Eng.
 
 C. 141 Division Street
 
 52
 Interdonato's only pre-search knowledge of the 141 Division Street condo came from a confidential source. It is not clear whether Interdonato would have taken action solely on the basis of his pre-search information, for it appears that this information was not even written down by Interdonato. Only the bank records and the condominium unit number found in the safe confirmed that Eng owned the property in the first instance. Further, if a unit number is required in a title search, then it will be more difficult for the government to establish inevitable discovery of the condominium evidence. Interdonato testified he would have gone to the building and asked which unit belonged to Eng, but it is uncertain whether this method of discovery rests on demonstrated facts capable of ready verification.
 
 
 53
 D. 26 Bowery, Chinese Moon and World Express
 
 
 54
 While significant information about the 26 Bowery building was known prior to the unlawful search--Eng's interest in the building (through Bowery Mansion), the selling corporation (26 Bowery Corp.), the name of the seller's attorney (Ronald De Petris) and the names of Eng's attorneys--it was the search of the safe that revealed the names of the owners of 26 Bowery Corp., Sol Leitner and Frieda Grant. The important evidence admitted at trial concerned closing information on the price paid and amount borrowed by Eng to purchase the 26 Bowery building. At least some of the closing information admitted at trial may have been provided only by Leitner and Grant. To the extent that Leitner and Grant were the source of the closing information, inevitable discovery of the evidence in their possession becomes more difficult to prove because their identities were discovered in the search of the safe, and alternate routes to discovery of these parties may be attenuated.
 
 
 55
 Interdonato knew prior to the unlawful search that a series of cashier's checks issued by Hang Seng Bank had been deposited into Chinese Moon's National Westminster Bank account. After the arrest of Eng, Interdonato subpoenaed Hang Seng Bank, and discovered a variety of records admitted at trial showing that these cashier's checks originated from parties in Hong Kong. Subject to the district court's fact finding, this seems to us a convincing showing of inevitable discovery of the records in question. Interdonato had detailed knowledge of fund transfers, rooted in pre-search events, and the only step that remained to discovery was issuance of a subpoena for the types of records Hang Seng Bank probably would produce.
 
 
 56
 It appears that Interdonato first learned of the existence of World Express from the National Westminster Bank checkbook discovered in Eng's safe. After the search, National Westminster Bank was subpoenaed, and a series of cashier's checks and wire transfer deposits into the World Express account discovered. The banks from which the funds originated--Wing Lung Bank, Kwantung Bank, and BCCI--then were subpoenaed, leading to the discovery of additional evidence admitted against Eng. It is possible that discovery of the mere existence of World Express was inevitable. Wang F. Luk, the accountant, and Frank Lam, the attorney, both of whom apparently had some information on World Express, were known to the government prior to the search. However, a case for inevitable discovery of the information produced by Wing Lung Bank, Kwantung Bank, and BCCI would appear to involve a far more attenuated chain of events.
 
 E. The Florida Properties
 
 57
 The only connection between Interdonato and the Florida properties evident in the record is that provided by the documents found in the safe. Those documents identified the address of the house and Eng's ownership of the boat, apparently facilitating a title search and further subpoenas, all of which led to discovery of the evidence admitted at trial. If our understanding of the record is confirmed by the district court on remand, then it will be difficult for the government to meet its burden of proving inevitable discovery of the Florida properties. The government urges that Interdonato inevitably would have found the boat regardless of the search of the safe, because the Florida house had a marina. This argument is inadequate if the search of the safe revealed to the government for the first time that Eng had a house in Florida, and no other convincing connection to the house can be established.
 
 CONCLUSION
 
 58
 The judgment of conviction is vacated and the case is remanded for particularized findings, consistent with the foregoing, supporting the district court's conclusion that the challenged evidence inevitably would have been discovered. This panel will retain jurisdiction of the appeal pending completion of the findings hereby directed and the return of same to this Court.
 
 
 
 *
 The Hon. John S. Martin, Jr., United States District Judge for the Southern District of New York, sitting by designation